JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMY E. CASSIS, et al., | CASE NO. SA CV 17-0148-DOC (KESx) |
| Plaintiffs, | |
| vs. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| SUN LIFE ASSURANCE COMPANY OF CANADA (U.S.), et al., | |
| Defendants. | |

## I. INTRODUCTION

This case arises out of a disagreement about the calculation methodology of a death benefit provision contained in an annuity contract issued by Defendant Sun Life Assurance Company of Canada (U.S.), now known as Delaware Life Insurance Company ("Defendant" or "the Company" or "Delaware Life"), to Plaintiffs Samy E. Cassis and Gehane F. Cassis (collectively, "Plaintiffs") on July 6, 1998.

As a result of this dispute about the proper interpretation of the annuity contract's death benefit provision, Plaintiffs filed an action against Defendant in the Superior Court of California, County of Orange on December 23, 2016. *See* Complaint ("Compl.") (Dkt. 1-1). Plaintiffs' Complaint asserted eight claims: (1) declaratory relief; (2) breach of contract; (3) breach of covenant of good faith and fair dealing (tort) [sic]; (4) money had and received; (5) conversion; (6) intentional misrepresentation; (7) negligent misrepresentation; and (8) violation of California Business & Professions Code § 17200. *See* Compl. ¶¶ 34-91. On January 27, 2017, Defendant removed the action to this Court. Notice of Removal (Dkt. 1).

On November 14, 2017, Delaware Life filed a Motion for Summary Judgment on all claims in the Complaint. By order issued on January 18, 2018, granting in part and denying in part Defendant's Motion for Summary Judgment (Dkt. 68), the Court found that Plaintiffs' claims for breach of the covenant of good faith and fair dealing (third cause of action), money had and received (fourth cause of action), conversion (fifth cause of action), intentional misrepresentation (sixth cause of action) and negligent misrepresentation (seventh cause of action), and violation of California Business & Professions Code § 17200 (eighth cause of action) were barred by the applicable statute of limitations. The Court further found that Plaintiffs' second cause of action for breach of contract was not yet ripe, and that the Court therefore lacked subject matter jurisdiction to adjudicate that claim. Finally, the Court found that Plaintiffs' first cause of action for declaratory relief was not barred by the statute of limitations, but that summary judgment

was nonetheless precluded by the fact that a genuine dispute of material fact existed about the terms of the applicable death benefit provision, which prevented the Court from reaching the merits of the parties' arguments about the proper interpretation of the provision.

Following the Court's summary judgement ruling, the only claim remaining in the action is Plaintiffs' first cause of action for declaratory relief. The issue on Plaintiffs' claim for declaratory relief is "[w]hether the death benefit language in the annuity contract should be interpreted such that the withdrawal amount stops accruing interest when the purchase payment doubles (Plaintiffs' interpretation) or conversely, whether the purchase payment and withdrawal amounts each accrue interest independently, until each of those respective amounts doubles (Defendant's interpretation)." Resolving this actual controversy about the interpretation of the death benefit provision requires the Court to (1) decide what the contract language is for the death benefit of an annuity contract that Plaintiffs purchased for about $200,000 from Defendant in June 1998 (i.e., establish the applicable terms of the contract); and (2) interpret the language of that death benefit provision and determine the meaning of the 5% Accumulation Provision.

Plaintiffs filed their trial brief (Dkt. 86) on March 9, 2018, and Defendant filed its trial brief on March 12, 2018 (Dkt. 90). On March 19, 2018, Plaintiffs filed an opposition to Defendant's trial brief (Dkt. 93), and Defendant then filed a responsive trial brief (Dkt. 95) on March 26, 2018. On April 9, 2018 the Court held a hearing that constituted trial of Plaintiffs' sole remaining claim for relief. Having considered all the evidence presented by the parties and the written submissions from both sides, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

## II. FINDINGS OF FACT[1]

### A. Plaintiffs Purchase Annuity in 1998 and Later Make Partial Withdrawals

1. On or about June 29, 1998, Plaintiffs decided to transfer $200,000 from their mutual funds to a tax deferred annuity sold and operated by Defendant. To do so, Plaintiffs filled out an MFS Regatta Gold Participant Application, which named each of the Plaintiffs as co-annuitants in a joint tenancy with the right of survivorship. Plaintiffs paid $199,817.50 ("Purchase Payment") from their existing mutual funds (after costs) to purchase the annuity, called the MFS Regatta Gold Variable And Fixed Annuity Sun Life Of Canada (U.S.) Variable Account F ("Annuity" or "Annuity Contract"). Cassis Decl. ¶ 2; Ex. 1.

2. At the same time, Plaintiffs filled out and signed a Change of Investment Request document, which states that Plaintiffs wanted to buy the Annuity for the following reasons: (1) obtain tax-deferred growth on their investments to supplement their retirement income; (2) have a guaranteed death benefit; and (3) minimize Plaintiffs' taxable income on their investments. Cassis Decl. ¶ 3; Ex. 2. At about the same time on or about June 29, 1998, Ronald Grigsby, of Washington Mutual Financial Services, Inc. (acting as agent for Sun Life of Canada (U.S.)) filled out and executed a Change Of Investment Request to transfer $200,000 from Plaintiffs' Oppenheimer Mutual Funds to their Annuity set for June 30, 1998. Cassis Decl. ¶ 3; Ex. 2.

3. In connection with this Annuity purchase, Plaintiffs and Mr. Rigsby also executed an Explanation of Your Investment, which states at Item 10 that Plaintiffs "received a prospectus on the investment" and that "the terms of [the] annuity investment are governed by an annuity contract." Ex. 3.

4. However, despite this acknowledgement, Samy Cassis claims that Plaintiffs never

---

[1] To the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

received the prospectus. Cassis Decl. ¶ 4.

5. The Annuity Contract became effective on July 6, 1998, and has remained in force since then. The Annuity had a commencement date of October 1, 2060. The Annuity has Certificate Number 7700104111 and Contract Number 507707700104111. *See* Cassis Decl. ¶ 6; Final Pre-Trial Conference Order at 5 (listing admitted facts).

6. The Annuity is a flexible premium payment product, which means that the Participant may continue to periodically pay funds into the contract, or periodically withdraw funds from the product, for as long as the contract remains in force.

7. On or about May 17, 2007, Plaintiffs withdrew $200,000 (a "partial withdrawal") from the Annuity. Cassis Decl. ¶ 8; Ex. 6.

8. On or about April 16, 2009, Plaintiffs withdrew $7,000 from the Annuity. Cassis Decl. ¶ 9; Ex. 7.

9. A dispute then arose between the parties as to the 5 % Accumulation provision, which is one of the alternative death benefit calculations under Plaintiffs' contract. *See* Cassis Decl. ¶¶ 10–25.

10. If Plaintiffs had known that the death benefit promised to them by Mr. Rigsby in June 1998 would be diminished, and potentially even completely depleted, as a result of making the two withdrawals, they never would have purchased the Annuity. Cassis Decl. ¶ 26.

   **B. Establishing the Terms of the Contract Purchased in 1998**

11. Defendant asserts that it issued the original annuity Certificate with the terms of the death benefit provision to Plaintiffs at the time of sale in 1998. Plaintiffs claim they never received it. Neither party has a copy of the original—it is lost[2]—and thus the

---

[2] Defendant claims that its customary practice and procedure is to issue the original Certificate to the Participant upon approval of the application and receipt of the initial purchase payment. Koutsis Decl. ¶ 14. The company does not retain the original Certificate or maintain photocopies of the original Certificate. Crowley Decl. ¶¶ 21–22; Koutsis Decl. ¶ 14. Instead, it maintains the contract information electronically, and can create a duplicate or "specimen" Certificate at any time after issue. Crowley Decl. ¶ 22; Koutsis Decl. ¶ 14.

5

1     Court must look to other evidence to determine the language of the death benefit provision in the Annuity Contract between Plaintiffs and Defendant. *See* Fed. R. Evid. 1004.

12. Before the Court is the specimen Certificate ("2015 Certificate") generated in 2015 by Defendant at Plaintiffs' request. Ex. 32. The 2015 Certificate contains all terms, conditions and provisions of the original, together with all endorsements current as of the date of printing. *See* Ex. 32. Courts have turned to specimens to establish insurance policy terms when the original policies have been lost.

13. Other evidence before the Court includes the Flexible Payment Deferred Combination Variable and Fixed Group Annuity Contract Nonparticipating no. 0001-076784 issued to MFS Regatta Insurance Trust ("Group Contract"), under which the Certificate was issued, the May 1, 1998 Prospectus given to Plaintiffs at time of sale,[3] and the documents attached by the company to its 1994 annual Securities and Exchange Commission registration statement amendment filing, which included the Contract, the Certificate, and the November 1, 1994 Prospectus. The language describing the Amount of Death Benefit, which is the subject of the Court's analysis, is the same across all these documents, as explained below.

14. On September 20, 1994, Sun Life Assurance Company of Canada (U.S.) filed an N-4 Amendment to Registration Statement with the United States Securities and Exchange Commission ("SEC") that pertained to its Flexible Payment Deferred Combination Variable and Fixed Annuity, branded Regatta Gold.[4] *See* Ex. 41. The Form N-4 filing included the Prospectus, the Contract issued to MFS Regatta

---

[3] Plaintiff Samy Cassis claims he did not receive the 1998 Prospectus, yet both he and his wife, Gehane, acknowledged receipt of the Prospectus on both their 1998 Application and on their 1998 COI. Ex. 2; Ex. 31; Ex. 33. Plaintiffs' written acknowledgment of receipt at time of sale carries more weight than their recollection 20 years later in their role as Plaintiffs in a lawsuit.

[4] Annual registration statement amendments are required to be filed with the SEC because Regatta Gold contains a variable investment component, and is therefore a security. By SEC order, this Registration Statement amendment became effective on November 1, 1994. *See* Ex. 41 at DL003942.

| | |
|---|---|
| 1 | Insurance Trust, and a specimen of the Certificate that is issued to the participant |
| 2 | purchaser with an individualized Specifications page. Ex. 41. As shown by this N-4 |
| 3 | filing, the description of the 5% Accumulation calculation is consistent across the |
| 4 | Certificate, Group Contract and Prospectus. *See* Ex. 41 at DL003970, DL004068, |
| 5 | DL004095. |

15. On June 19, 2015, Plaintiffs requested a copy of the Certificate from Defendant, and Defendant generated and provided them a specimen Certificate. *See* Koutsis Decl. ¶ 16; Ex. 32. Plaintiffs argue the Specimen Certificate they received cannot describe the original terms and conditions relative to the contract or its death benefit provisions because it contains post-issue endorsements. The Court rejects this argument, because the endorsements are included to reflect all current contract terms, and in any case the endorsements are unrelated to the death benefit provision at issue. Moreover, the 5% Accumulation calculation provision in the Specimen Certificate produced in 2015 is identical to that in the Group Contract. *See* Ex. 32; Ex. 40.

16. While Plaintiffs argue that the Specimen Certificate is "not the contract," Plaintiffs offered no other document in existence at the time of purchase containing different terms.[5]

17. Because the death benefit provision language is identical in the 1998 prospectus, the Specimen Certificate generated from Defendant's company records, and the Group Contract under which the Certificate issued, the Court finds that that language constitutes the terms of the Contract between Plaintiffs and Defendant.[6] *Compare* Ex. 32 at DL000833; Ex. 33 at DL00126; Ex. 40 at DL003929. The specific contractual

---

[5] Plaintiffs at one point suggest that the terms of their annuity should be deemed to be those found in the post-issue prospectuses of 2009, 2012, and 2016. However, those prospectuses were not in effect at the time of sale, because they post-date the sale. The 1998 prospectus, which was in effect at the time of sale, contains 5% Accumulation language identical to the Contract.

[6] The court finds these documents reliable and authentic (i.e. what Defendant claims them to be). Plaintiff has not offered any evidence suggesting otherwise.

(footnote continued)

7

terms that are relevant to the Court's decision are described below.

**C. Relevant Terms of the Contract[7]**

18. The Certificate provides an account value, funded by Purchase Payments, and carries a death benefit.
19. The account continues "during the lifetime of the Annuitant until the Annuity Commencement Date or until the Participant's Account is surrendered."
20. The Annuity Commencement Date ("ACD") is October 1, 2060.
21. At any time prior to the ACD, the Participant may elect to receive a cash withdrawal payment from the Company.
22. The Participant "may request a full surrender or a partial withdrawal."
23. The Certificate states, "If the Annuitant dies while the contract and this certificate are in effect, and before the Annuity Commencement Date, the Company, upon receipt of Due Proof of Death of the Annuitant, will pay a death benefit to the Beneficiary in accordance with this Death Benefit provision."
24. The Certificate further provides: "If the Annuitant was less than 86 on the Date of Coverage, the death benefit is determined as of the effective date or deemed effective date of the death benefit election and is equal to the greatest of (a) the Participant's Account Value for the Valuation Period during which the death benefit election is effective or is deemed to become effective; (b) subject to the conditions set forth in the next paragraph, the excess of (i) the sum of all Purchase Payments made under the certificate over (ii) the sum of all partial withdrawals; (c) the Participant's Account Value on the Seven Year Anniversary immediately preceding the date the death benefit election is effective or is deemed to become effective, adjusted for any

---

[7] Based on the evidence presented, the Court finds that these are the terms of the death benefit provision of the annuity purchased by Plaintiffs. However, the Court notes that even if the exact language was instead the language used in the more recent prospectuses cited by Plaintiffs, the Court's interpretation of the death benefit provision (as explained below, in the Conclusions of Law), would be the same.

8

subsequent Purchase Payments and partial withdrawals and charges made between the immediately preceding Seven Year Anniversary and the date the death benefit election is effective or is deemed to be effective; or (d) the amount that would have been payable in the event of a full surrender of the Participant's Account on the date the death benefit election is effective or is deemed to be effective."

25. The 5% Accumulation provision of the Death Benefit Provision explains how the Option (b) Death Benefit is calculated: "For the purpose of calculating the amount due under (b) in the preceding paragraph, the following conditions will apply: i) until the first day of the month following the Annuitant's 80th birthday, each Purchase Payment and each partial withdrawal will accumulate daily at a rate equivalent to 5% per year; ii) no such accumulation will apply to a Purchase Payment or a partial withdrawal once that Purchase Payment or partial withdrawal has, as a result of such accumulation, grown to double its original amount."

26. The dispute in this case concerns the proper interpretation of only this last paragraph, the 5% Accumulation provision.

### III. CONCLUSIONS OF LAW

27. Under their cause of action for declaratory relief, Plaintiffs seek a judicial declaration that their interpretation of the 5% Accumulation provision, rather than Defendant's interpretation, is the proper one.[8] Plaintiffs argue that once either the Purchase Payment doubles or a partial withdrawal doubles in accordance with the Accumulation provision, interest accumulation on all payments and withdrawals stops and the death benefit becomes fixed. As a result, Plaintiffs claim that their death benefit became fixed at $132,360 on September 6, 2012, when the Purchase Payment had doubled under the Accumulation Provision.

---

[8] To the extent that Plaintiffs claim in their briefs that Defendant violated certain state or federal laws, those claims are not currently before the court; many of them failed at summary judgment as a result of the relevant statutes of limitations.

28. In contrast, Defendant argues that, under the contractual language, interest stops accumulating only on the specific payments or withdrawals that have doubled, but continues accumulating on all other payments and withdrawals that have not yet doubled in amount, such that the interest on Plaintiffs' partial withdrawals continued to accumulate even after the Purchase Payment had doubled and stopped accumulating interest.

29. Having established the relevant language of the death benefit provision, the Court now turns to interpreting that contractual language.

30. Contract interpretation is a question of law, and an annuity contract is interpreted according to ordinary rules of contract interpretation. *See* Cal. Civ. Code § 1638; *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18–19 (1995); *Gutowitz v. Transamerica Life Ins. Co.*, 126 F. Supp. 3d 1128, 1136 (C.D. Cal. 2015). The plain meaning of the contract provisions determines the mutual intention of the parties. Cal. Civ. Code § 1639; *Connick v. Teachers Ins. And Annuity Assn. of America*, 784 F.2d 1018, 1020 (9th Cir. 1986). Contract terms are to be read in a popular sense. *Connick*, 784 F.2d at 1020.

31. Language that is clear and explicit governs, and must be given effect. Cal. Civ. Code § 1638.

32. However, when a court concludes that contract language is ambiguous, it examines whether a finding of coverage is consistent with the objectively reasonable expectations of the insured.

33. Ambiguity may only be found when contract language is not clear, and when the language is subject to two or more constructions that are equally reasonable. *See Connick*, 784 F.2d at 1020; *Gutowitz*, 126 F. Supp. 3d at 1136–37; *Pacific Marine; Baker v. Nat'l Interstate Ins. Co.*, 180 Cal. App. 4th 1319, 1327–28 (2009); *La Jolla Beach & Tennis Club v. Industrial Indemnity Co.*, 9 Cal. 4th 27, 37 (1994). Even then, with the aim of effecting the parties' intentions, the court must look to the four

corners of the contract and consider the language in the context of the whole. *See Rydstrom v. Fed. Ins. Co.*, 263 F. Supp. 3d 868, 876–77 (C.D. Cal. 2017).

34. When ambiguity remains after the reasonable expectations test is applied, the court strictly construes the ambiguous policy language against the insurer and in favor of coverage for the insured, without rewriting the policy to include risk not contemplated. *See Gutowitz*, 126 F. Supp. 3d at 1136–37. Any ambiguous or uncertain contract terms must be interpreted in the sense in which the promisor believed, at the time when made, the promisee understood them. Cal. Civ. Code § 1649; *Gutowitz*, 126 F. Supp. 3d at 1136.

35. Plaintiffs argue that the contract is ambiguous in part because there is no certainty about what the contract actually says (because, according to Plaintiffs, they never received the contract and the original Certificate is lost). However, the Court already addressed in the Findings of Fact section what the terms of the contract are, and thus in interpreting those terms focuses on whether the meaning of those established terms is ambiguous.

36. As explained below, the Court finds that the language of the 5% Accumulation provision is clear and unambiguous, and that under the plain meaning of that language, each Purchase Payment and each partial withdrawal accrues interest at 5%, independently, until each payment or withdrawal doubles.

37. The 5% Accumulation provision starts with Section (i), which states that "each Purchase Payment and each partial withdrawal will accumulate daily at a rate equivalent to 5% per year." Repetition of the word "each" to introduce both purchase payments and partial withdrawals demonstrates that each payment and each withdrawal is considered independently. Plaintiffs made one Purchase Payment and two partial withdrawals. Each of the three transactions is independently subject to the 5% Accumulation provision. Plaintiffs' Purchase Payment and two partial withdrawals each accumulate daily at a rate equivalent to 5% per year.

38. Section (ii) then stops the accumulation on each Purchase Payment and each partial withdrawal when it doubles: "no such accumulation will apply to a Purchase Payment or partial withdrawal once that Purchase Payment or partial withdrawal has, as a result of such accumulation, grown to double its amount." The words "Purchase Payment or partial withdrawal" are repeated, and the word "that" is used before the second instance of those words to refer back to whichever Purchase Payment or partial withdrawal is at issue. Thus, the phrase "grown to double its amount" applies to each Purchase Payment and each partial withdrawal. The 5% accumulation on each Purchase Payment stops when that Purchase Payment has grown to double its amount. Likewise, the 5% accumulation on each partial withdrawal stops when that partial withdrawal has grown to double its amount.

39. Plaintiffs' contrary interpretation, that accumulation on all payments and withdrawals stops once the Purchase Payment doubles, contradicts the plain meaning of the contractual language. Specifically, Plaintiffs contend that under Section (ii), the 5% accumulation on their partial withdrawals stopped when the Purchase Payment doubled on September 16, 2012. In effect, Plaintiffs seek to add a condition that "freezes" or "waives" any further accumulation of interest on the withdrawals. The Contract contains no such condition. Under the terms of the Accumulation provision, "*each* Purchase Payment and *each* partial withdrawal will accumulate daily at a rate equivalent to 5% per year," but interest accumulation stops "once *that* Purchase Payment or partial withdrawal has . . . grown to double its original amount." Plaintiffs' proposed interpretation would have the Court substitute the words "either the" for "that" so as to stop interest accumulation "once either the Purchase Payment or partial withdrawal has . . . grown to double its amount." Because Plaintiffs' interpretation completely changes the plain meaning of the clause, it must be rejected. The 5% interest accumulation continues on each partial withdrawal until that partial withdrawal amount has doubled.

40. Defendant's interpretation is consistent with the Contract's intent. The 5% accumulation calculation method must apply equally and equitably to each Purchase Payment and each partial withdrawal when calculating Option (b)'s death benefit amount. Plaintiffs' construction of the 5% Accumulation calculation provision is not "equally reasonable"; it is unreasonable and contrary to both economic sense and the purpose of the Contract as a whole. In particular, Plaintiffs' claim that they can effectively "lock in" a permanent death benefit amount despite later withdrawing over 96% of their account value would result in a windfall. Conversely, if Plaintiffs had made additional purchase payments later on, under their theory those payments would not accrue interest after the original purchase payment doubled, which would be unfair to Plaintiffs.

41. In addition, Plaintiffs' brief argument that the calculation methodology described by the plain terms of the death benefit provision cannot be enforced against Plaintiffs is unavailing, because the only case Plaintiffs cite involves an inconspicuous exclusion of automobile liability coverage. The language at issue here involves the calculation of a benefit, not the exclusion of coverage under an insurance contract.

42. Taken in the context of the whole Contract, Option (b)'s 5% Accumulation calculation is only one of four possible death benefit values, if and when a death benefit becomes due and payable. The amount of the death benefit payable is whichever value is greatest at the time of the second annuitant's death.

43. Plaintiffs chose to withdraw a substantial portion of their account value, and depending on their future conduct (additional payments and withdrawals), market forces (impacting investment performance of the variable subaccounts) and mortality (governing time of calculation), it is possible that the greatest death benefit value for Plaintiffs may be one of the other three options.

## IV. CONCLUSION

For the reasons explained above, the Court HOLDS that Defendant's interpretation of the Annuity's death benefit provision is unambiguously correct. Contrary to Plaintiffs' assertion, accumulation did not stop on the withdrawals once the Purchase Payment doubled. Defendant shall submit a proposed judgment **on or before April 5, 2019.**

DATED: March 29, 2019

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE